UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

           Plaintiff,

v.

RALPH EDWARD CLOUD, JR.,

           Defendant.

Court File No. 21-cr-14 (MJD/LIB)


**REPORT AND RECOMMENDATION**

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, and upon Defendant Ralph Edward Cloud, Jr.'s ("Defendant") Motion to Suppress Statements, Admissions, and Answers On and After September 13, 2020, [Docket No. 45], Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Warrants), [Docket No. 47], and Defendant's Motion to Suppress Evidence Obtained as a Result of September 13, 2020 Warrantless Searches and Seizures, [Docket No. 48]. The Court held a Motions Hearing on May 27, 2021, regarding the parties' pretrial motions at which the parties requested the opportunity to submit supplemental briefing on the present motions. The supplemental briefing was completed on July 16, 2021, after which Defendant's Motion to Suppress Statements, Admissions, and Answers On and After September 13, 2020, [Docket No. 45], Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Warrants), [Docket No. 47], and Defendant's Motion to Suppress Evidence Obtained as a Result of September 13, 2020 Warrantless Searches and Seizures, [Docket No. 48], were taken under advisement.[1]

---

[1] The Court addressed the parties' pretrial discovery motions by separate Order. [Docket No. 79].

For the reasons discussed herein, the Court recommends that: Defendant's Motion to Suppress Statements, Admissions, and Answers On and After September 13, 2020, [Docket No. 45], be **GRANTED in part** and **DENIED in part**; Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Warrants), [Docket No. 47], be **DENIED**; and Defendant's Motion to Suppress Evidence Obtained as a Result of September 13, 2020 Warrantless Searches and Seizures, [Docket No. 48], be **DENIED**.

## I.    Background and Statement of Facts

### A.  Background

Defendant is charged with one count of murder in the second degree, in violation of 18 U.S.C. §§ 1111, 1151, and 1153(a). (Indictment [Docket No. 1]).

### B.  Facts

Shortly after midnight on September 13, 2020, the Red Lake Tribal Police Department received a report that somebody was dead at a residence in Little Rock, Minnesota, on the Red Lake Indian Reservation (the "Smith Residence") and there was blood all over. (Def.'s Ex. 5, at 1). Allen Smith and Darrick Smith both lived at the Smith Residence, and they are both first cousins of Defendant. (Tr. [Docket No. 78], at 72–73, 78). Red Lake police officer Kendal Kingbird ("Officer Kingbird") arrived at the Smith Residence and was informed that there was a deceased individual inside the residence. (Def.'s Ex. 4, at 5). Officer Kingbird entered the residence, and he located Allen Smith who was unresponsive. (Id. at 5–6; Tr. [Docket No. 78], at 72). Red Lake EMS subsequently confirmed that Allen Smith was deceased. (Def.'s Ex. 4, at 6). By approximately 12:47 a.m. Red Lake police officers had conducted a sweep and confirmed that no one else was inside the Smith Residence. (Def.'s Ex. 5, at 2).[2] However, law enforcement

---

[2] At the Motions Hearing, Defendant, without objection, offered a dispatch log from the morning of September 13, 2020, into evidence as Defendant's Exhibit 5. (Tr. [Docket No. 78], at 9).

maintained a continuous presence outside the Smith Residence until a search warrant was obtained and executed on the residence at approximately 5:57 a.m. (Id. at 7; Tr. [Docket No. 78], at 81–84; Def.'s Ex. 6, at 1).

After receiving notification of the reported homicide, the Federal Bureau of Investigation ("FBI") began an investigation, and several federal agents responded to the scene to assist. (See, e.g., Tr. [Docket No. 78], at 27–29). FBI Special Agent Justin Montgomery ("SA Montgomery") was originally the case agent assigned to the investigation. (Id. at 69).

In the early morning hours of September 13, 2020, FBI Special Agent Christopher S. Dudley ("SA Dudley") received a call about the reported homicide at the Smith Residence. (Tr. [Docket No. 78], at 26–28). SA Dudley responded to the Smith Residence at approximately 1:00 a.m., and he parked his unmarked FBI vehicle on the highway near the driveway to the Smith Residence. (Id. at 27–29, 31, 80). After arriving at the Smith Residence, SA Dudley learned that other agents were conducting witness interviews elsewhere. (Id. at 29). SA Dudley also learned that Defendant was a suspect in the homicide based on witness interviews that had been conducted, as well as, social media posts. (Id. at 29–30). Moreover, SA Dudley learned that Defendant was believed to be at his residence (the "Cloud Residence"), and a Red Lake investigator and tribal officer were on their way to that location. (Id. at 30).

SA Dudley agreed to assist the tribal law enforcement officers at the Cloud Residence. (Id.). SA Dudley then exited his vehicle, and he put on body armor and a helmet. (Id. at 31, 32). SA Dudley did not exit his vehicle at the Smith Residence other than to put his body armor and helmet. (Id. at 81). SA Dudley followed tribal law enforcement vehicles, that were then driving past his location, to the Cloud Residence. (Id. at 30, 32). Two or three Red Lake police officers arrived at the Cloud Residence before SA Dudley. (Id. at 87).

3

Upon arriving at the Cloud Residence, SA Dudley parked his unmarked FBI vehicle in the driveway, secured his rifle, and exited his vehicle. (Id. at 33). Red Lake Criminal Investigator Jonathan Richards ("CI Richards") and Officer Kingbird had already approached and entered the Cloud Residence through the back door. (Id. at 90).

At around 2:30 a.m., SA Dudley approached the back door of the Cloud Residence. (Id. at 34–35, 80). SA Dudley was wearing his body armor and helmet, and he held his AR-15 style rifle slung over his shoulder with the muzzle pointing down. (Id. at 88–89). SA Dudley remained on the back porch without entering the Cloud Residence, and he observed CI Richards and Officer Kingbird placing Defendant in custody. (Id. at 35, 90–91). Defendant was compliant with the tribal officers, and although there were other people on the porch and in the Cloud Residence, SA Dudley did not perceive that they were a threat to law enforcement. (Id. at 35–36, 89–91). After observing that Defendant was being cooperative and that the other individuals did not pose a threat to law enforcement, SA Dudley decided to attempt to take a statement from Defendant. (Id. at 86).

Shortly thereafter, the tribal police officers exited the Cloud Residence with Defendant, who was handcuffed. (Id. at 37–38). The tribal officers brought Defendant to their vehicles in front of the Cloud Residence, and SA Dudley continued to his vehicle. (Id. at 38). While Defendant was near the tribal police vehicles, he was given a breathalyzer test, and the result was .067. (Id. at 41–42, 44–45, 54).

SA Dudley removed his body armor and helmet, and he put his rifle away. (Id. at 38, 94). SA Dudley then moved to the front of his vehicle where he planned on interviewing Defendant. (Id. at 39). After SA Dudley indicated that he was ready to speak with Defendant, CI Richards

and Red Lake police officer Joseph Heyer ("Officer Heyer") walked Defendant to the front of SA Dudley's FBI vehicle. (Id. at 42–43, 95).

Defendant was still handcuffed when he arrived at SA Dudley's FBI vehicle. (Id. at 42, 47). Defendant had some dried blood on the side of his head from what appeared to SA Dudley to be some type of laceration.[3] (Id. at 47, 55). SA Dudley introduced himself, and he asked if Defendant was looking to receive medical treatment. (Gov't Ex. 1, at 00:15–00:30). Defendant stated, "yeah, I guess so." (Id. at 00:30). SA Dudley asked if he was "okay right now," and Defendant affirmatively responded, "yeah, I'm alright." (Id. at 00:35; see also, Tr. [Docket No. 78], at 48). SA Dudley then proceeded to interview Defendant. (Id. at 43). The entire interview was recorded.[4] (Id. at 43–44; see also, Gov't Ex. 1). The interview took place in front of SA Dudley's FBI vehicle, and the recorder was placed on the hood of the vehicle. (Tr. [Docket No. 78], at 44–45, 95). During the interview, SA Dudley was standing in front of the truck on the driver's side, CI Richards was standing to SA Dudley's left, and Defendant was standing in front of the truck on the passenger's side. (Id. at 51–52). Officer Heyer was behind Defendant when the interview began, but he stepped back shortly thereafter. (Id. at 52, 56, 96–99). SA Dudley was casually dressed, CI Richards was in plainclothes, and Officer Heyer was in uniform. (Id. at 45–46, 94–95). The law enforcement officers' weapons were holstered throughout the interview. (Id. at 46, 57).

At the outset of the interview, SA Dudley informed Defendant of his Miranda rights as follows:

---

[3] At the Motions Hearing, SA Dudley testified that the blood appeared to have been there for some time, and Defendant did not have a fresh, actively bleeding wound. (Id. at 55). SA Dudley further testified that Defendant did not appear to be in any type of duress or pain from the injury. (Id.).

[4] At the Motions Hearing, the Government, without objection, offered the recording of the September 13, 2020, interview into evidence as Government's Exhibit 1, and Defendant, without objection, offered an FBI summary report of the September 13, 2020, interview into evidence as Defendant's Exhibit 4. (Tr. [Docket No. 78], at 9).

Before I ask you any questions you have to understand your rights, okay. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during questioning. If you can't afford a lawyer, one will be appointed to you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time. Um, okay, so even if you wanted to talk to me, anything you don't want to answer or if you want to stop, you're welcome to at any time.

(Gov't's Ex. 1, at 00:40–1:10). After SA Dudley completed reading the entire <u>Miranda</u> warning, he asked Defendant, "do you understand the rights that I've just read to you? (<u>Id.</u> at 1:10). Defendant clearly responded, "yes." (<u>Id.</u>). SA Dudley then asked Defendant, "understanding these rights are you—are you willing to talk to me about what happened tonight? (<u>Id.</u> at 1:15). Defendant responded, "yeah, I could, yeah." (<u>Id.</u> at 1:20).

Immediately thereafter, the interviewers unhandcuffed Defendant and provided him with an FBI Advice of Rights form to read.[5] (<u>Id.</u> at 1:30–3:00; Tr. [Docket No. 78], at 52). SA Dudley asked if Defendant could read and write English, and Defendant confirmed that he could. (Gov't's Ex. 1, at 1:50–2:00). SA Dudley asked Defendant if he understood the FBI Advice of Rights form, and Defendant stated that he did. (<u>Id.</u> at 2:20). SA Dudley then explained to Defendant that by signing the FBI Advice of Rights form, he was indicating that he was willing to answer questions without a lawyer present. (<u>Id.</u> at 3:05). Defendant signed the FBI Advice of Rights form at 2:56 a.m. on September 13, 2020. (Gov't's Ex. 2).

---

[5] At the Motions Hearing, the Government, without objection, offered the FBI Advice of Rights form into evidence as Government's Exhibit 2. (Tr. [Docket No. 78], at 9). The FBI Advice of Rights form provided Defendant with a written <u>Miranda</u> warning that was essentially the same as that given verbally by SA Dudley. (<u>See</u>, Gov't's Ex. 2). The FBI Advice of Rights form also includes a consent statement that provides: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." (<u>Id.</u>).

The interviewers initially asked Defendant some basic questions, and he informed them that he lived at the Cloud Residence. (Id. at 4:25–5:10). The interviewers then began questioning Defendant about the circumstances surrounding Allen Smith's death. (See, e.g., Id. at 5:25).

Defendant stated that he woke up at the Cloud Residence, which he owned, around 12:00 p.m., and he drank some beers with Derrick Smith. (Id. at 5:35–6:20, 12:15). Defendant's wife, Tammi Cloud, subsequently took them to a liquor store around 2:00 p.m., and Defendant bought a half gallon of vodka. (Id. at 6:00–6:40, 13:25–13:50). Defendant, Tammi Cloud, and Derrick Smith then went to the Smith Residence at around 3 p.m. and drank some of the vodka. (Id. at 15:00–16:00). Allen Smith and Steve Whitefeather[6] were also at the Smith Residence. (Id. at 16:15–16:50). At around 5:00 p.m., Tammi Cloud and Allen Smith dropped Defendant off at the Cloud Residence, and he went to sleep. (Id. at 16:30–17:10). When Defendant woke up, he noticed Tammi Cloud was still gone, and he walked back to the Smith Residence. (Id. at 6:55–7:10, 17:10).

Defendant indicated that he arrived back at the Smith Residence around 6:00–7:00 p.m. (Id. at 17:45–18:10). When he arrived, Tammi Cloud, Allen Smith, Derrick Smith, and Steve Whitefeather were at the Smith Residence. (Id. at 18:25–18:40). Defendant entered through the front door, and he saw that Derrick Smith and Steve Whitefeather were sitting in the living room. (Id. at 18:40–19:20). Defendant stated that when he walked in, he already knew what was going on because that morning he noticed that Tammi Cloud had deleted text messages between herself and Allen Smith. (Id. at 19:20–20:30, 22:30–23:00).

Defendant stated that he went straight into one of the bedrooms and found his wife, Tammi Cloud, and Allen Smith naked in bed together. (See, e.g., Id. at 26:05–26:50). Defendant further stated that he got mad, and he admitted to punching Allen Smith several times. (See, e.g.,

---

[6] Steve Whitefeather is Tammi Cloud's son. (Tr. [Docket No. 78], at 78).

Id. at 26:50–27:55). Defendant also admitted to kicking Allen Smith in the groin and throwing a dresser at him. (Id. at 28:25–30:20). Defendant denied hitting Tammi Cloud. (Id. at 27:35). While Defendant was punching Allen Smith, Steve Whitefeather hit Defendant in the head with something. (Id. at 27:55–28:10, 30:45–31:50). Afterwards, Defendant walked back to the Cloud Residence. (Id. at 31:50–32:10). Defendant stated that when he left the Smith Residence, Allen Smith was breathing and moving around. (Id. at 31:50). Defendant also stated that Tammi Cloud subsequently called him, and she informed him that Allen Smith had passed away. (Id. at 25:20–25:40).

In addition, Defendant admitted to putting a post on his Facebook wall, which stated, "I'm sorry I might be going away for murder I caught my so called wife cheating on me." (Id. at 24:25–25:20). Defendant indicated that his sister, Alberta Smith, must have seen the Facebook post because she called him, and he told her about what had happened and that he was probably going away for a while. (Id. at 32:15–32:45).

Towards the end of the interview, Defendant told SA Dudley that he had changed clothes since leaving the Smith Residence. (Id. at 33:10). Defendant then gave the interviewers express permission to get his clothes from the Cloud Residence, he described the clothes, and he described where the clothes could be found in the residence. (Id. at 33:10–34:50). After Defendant consented to law enforcement officers retrieving his clothes, SA Dudley further requested Defendant's consent to take a DNA sample, and he indicated that he would get a DNA swab from his vehicle. (Id. at 34:50–35:10). Shortly thereafter, SA Dudley filled out an FBI Consent to Search form,[7] and he explained to Defendant that the form sought consent to search

---

[7] At the Motions Hearing, the Government, without objection, offered the FBI Consent to Search form, as well as, the receipt for property seized into evidence as Government's Exhibit 7, and Defendant, without objection, offered an FBI report of the September 13, 2020, search of Defendant and the Cloud Residence into evidence as Defendant's Exhibit 2. (Tr. [Docket No. 78], at 9).

his house, obtain a DNA sample, search his iPhone, and photograph Defendant and his injuries. SA Dudley further explained that Defendant had the right to refuse consent, and that the form authorized law enforcement agents to seize items which they determine may be related to their investigation. (See, Id. at 37:25–42:35; see also, Gov't Ex. 7, at 1). Defendant affirmatively indicated that he understood, and he signed the filled-out FBI Consent to Search form. (Gov't Ex. 1, at 42:35–43:05; Gov't Ex. 7, at 1). Defendant also provided SA Dudley with the passcode to access his iPhone. (Gov't Ex. 1, at 39:40–40:00).

At approximately 3:36 a.m. on September 13, 2020, SA Dudley ended the interview of Defendant and turned off the recorder. (Id. at 43:40–43:50). After the interview was completed, SA Dudley took some photographs of Defendant, as well as, a DNA swab. (Tr. [Docket No. 78], at 64–65, 103). Red Lake police officers then handcuffed Defendant, and they transported him to the Indian Services Hospital in Red Lake before ultimately taking him to the Red Lake jail. (Tr. [Docket No. 78], at 63–65).

Immediately thereafter, SA Dudley and other law enforcement officers entered the Cloud Residence to search for and seize Defendant's clothing. (Id. at 65–66, 104). SA Dudley found the clothing in the living room of the residence exactly as Defendant had described. (Id. at 66). SA Dudley testified that the search was limited to finding the items of clothing Defendant had described in his living room, and they were in the Cloud Residence for approximately ten to fifteen minutes. (Id. at 66, 104).

A few hours later, SA Dudley drove to the Red Lake jail, and provided Defendant with a receipt for the property seized from Defendant. (Id. at 67–68, 104, 111; see also, Gov't Ex. 7, at 2). SA Dudley testified at the Motions Hearing that he arrived at the Red Lake jail alone, but there was a corrections officer present when he met with Defendant. (Id. at 111). SA Dudley

further testified that the encounter was very brief, and that he did not recall Defendant saying anything about the present case. (Id. at 68, 111). Defendant signed the receipt. (Id. at 68; see also, Gov't Ex. 7, at 2). Thereafter, SA Dudley did not have an active role in the FBI's homicide investigation. (Tr. [Docket No. 78], at 71).

As part of the FBI's homicide investigation, on September 13, 2020, SA Montgomery filed a state court application for a search warrant to authorize law enforcement officers to search the Smith Residence. (Gov't Ex. 4).[8] In support of this application, SA Montgomery submitted an affidavit providing some of the details of the FBI investigation. (Id. at 4–7).

In the affidavit filed in support of the September 13, 2020, Search Warrant, SA Montgomery stated that at approximately 12:05 a.m. on September 13, 2020, the Red Lake Police Department received a report from Derrick Smith that there was a deceased individual at the Smith Residence. (Id. at 5). At approximately 12:11 a.m., Officer Kingbird arrived at the Smith Residence and was informed that there was a deceased individual inside the residence. (Def.'s Ex. 4, at 5). Officer Kingbird entered the Smith Residence, and he located an unresponsive male. (Id. at 5–6). "Officer Kingbird exited the residence and called Red Lake EMS." (Id. at 6). Red Lake EMS arrived at the Smith Residence, confirmed that the individual was deceased, and then departed. (Id.). The decedent had not yet been positively identified, but he was believed to be Allen Smith. (Id.).

SA Montgomery further stated that CI Richards notified him of the situation at approximately 12:15 a.m., and at approximately 1:22 a.m. he arrived at the Smith Residence. (Id.). Outside the residence, SA Montgomery indicated that he observed a baseball bat near the

---

[8] Government's Exhibit 4 is the warrant application, supporting affidavit, and warrant to search the Smith Residence. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 4, and Defendant, without objection, offered an FBI summary of the execution of the September 13, 2020, Search Warrant into evidence as Defendant's Exhibit 4. (Tr. [Docket No. 78], at 9).

front porch steps with apparent blood, apparent blood on the front porch and the door leading into the residence, and a white Pontiac Grand Am in the driveway with apparent blood outside of it, a visibly smashed windshield, and rock next to it. (Id.).

The Honorable Jeanine R. Brand, District Court Judge for the State of Minnesota, Ninth Judicial District, County of Beltrami, determined that probable cause existed to support the issuance of the September 13, 2020, Search Warrant. (Gov't Ex. 4). The September 13, 2020, Search Warrant authorized the search of the Smith Residence, as well as, the white Pontiac Grand Am parked in front of the residence. (Id. at 1, 3). At approximately 5:57 a.m. on September 13, 2020, SA Montgomery, CI Richards, and other law enforcement officers executed the September 13, 2020, Search Warrant. (Def.'s Ex. 6).

On October 9, 2020, SA Montgomery filed a federal court application for a search warrant to authorize law enforcement officers to search the contents of certain Facebook accounts. (Gov't Ex. 5).[9] The "Application for a Search Warrant" sought to search information associated with three Facebook URLs:

    a.  https://facebook.com/profile.php?id=100040164905291;

    b.  https://facebook.com/profile.php?id=100001612012958; and

    c.  https://facebook.com/profile.php?id=100014142437511.

(Id. at 16). In support of this application, SA Montgomery submitted an affidavit providing some of the details of the FBI investigation. (Id. at 2–15).

In the affidavit filed in support of the search warrant, SA Montgomery provided essentially the same information as he provided in reference to the September 13, 2020, Search Warrant. (See, Id.). However, SA Montgomery also provided additional information.

_____

[9] Government's Exhibit 5 is the warrant application, supporting affidavit, and warrant to search those Facebook accounts. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 5. (Tr. [Docket No. 78], at 9).

SA Montgomery indicated that Defendant had been interviewed by law enforcement officers. (Id. at 5). During that interview, Defendant stated that he noticed his wife, Tammi Cloud, and Allen Smith had been texting each other, and that on September 12, 2020, Tammi Cloud had deleted those text messages. (Id.). Defendant also stated that on September 12, 2020, he had been drinking at the Smith Residence before Tammi Cloud and Allen Smith drove him back to the Cloud Residence where he proceeded to fall asleep. (Id.). Later that evening, Defendant woke up and discovered Tammi Cloud was not at the Cloud Residence. (Id.). Defendant then walked to the Smith Residence where he discovered Derrick Allen and Steve Whitefeather siting in the living room. (Id. at 5–6). Defendant stated that he then went into a bedroom where he found Tammi Cloud and Allen Smith naked in bed together. (Id. at 6). Defendant further stated that he then proceeded to punch, kick, and throw a cabinet at Allen Smith. (Id.). When Defendant left to return to the Cloud Residence, Allen Smith was still breathing and moving. (Id.).

A few hours later, Tammi Cloud called Defendant and told him that Allen Smith had passed away. (Id.). Defendant "then made a post on his Facebook account to the effect of 'I'm sorry I might be going away for murder I caught my so call [sic] wife cheating on me." (Id.). SA Montgomery included a screenshot of that Facebook post in the affidavit. (Id. at 7). SA Montgomery also indicated that the Facebook URL https://facebook.com/profile.php?id=100040164905291 was identified as belonging to Defendant. (Id.). In addition, SA Montgomery indicated that Defendant had been shown that Facebook post and had stated the aforementioned Facebook account belonged to him, and he made that Facebook post. (Id.).

SA Montgomery further indicated that Tammi Cloud had been interviewed by law enforcement officers. (Id.). Tammi Cloud stated that Defendant, Allen Smith, and herself had previously decided to have a threesome, and after that threesome, she continued to have sex with Allen Smith. (Id.). Tammi Cloud also stated that on September 12, 2020, Defendant, Derrick Smith, Allen Smith, Steven Whitefeather, and herself had been drinking at the Smith Residence. (Id. at 8). Defendant had gotten too intoxicated, so she drove him home to the Cloud Residence, and then she returned to the Smith Residence. (Id.). Defendant subsequently returned to the Smith Residence, caught Tammi Cloud and Allen Smith having sex, and proceeded to punch Allen Smith. (Id.).

Moreover, SA Montgomery indicated that he had identified the Facebook URLs https://facebook.com/profile.php?id=100001612012958 and https://facebook.com/profile.php?id=100014142437511 as belonging to Tammi Cloud. (Id.).

The Honorable Jon T. Huseby, United States Magistrate Judge for the District of Minnesota, determined that probable cause existed to support the issuance of the October 9, 2020, Facebook Search Warrant. (Gov't's Ex. 5). Thereafter, the Government executed the October 9, 2020, Facebook Search Warrant.

Also on October 9, 2020, SA Montgomery filed a federal court application for a search warrant to authorize law enforcement officers to search the contents of a white Apple iPhone. (Gov't's Ex. 6, at 15).[10] In support of this application, SA Montgomery submitted an affidavit providing some of the details of the FBI investigation. (Id. at 2–14).

---

[10] Government's Exhibit 6 is the warrant application, supporting affidavit, and warrant to search that iPhone. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 6. (Tr. [Docket No. 78], at 9).

In the affidavit filed in support of the search warrant, SA Montgomery provided essentially the same information as he provided in reference to the October 9, 2020, Facebook Search Warrant. (See, Id.). However, SA Montgomery also provided additional information.

SA Montgomery indicated that Defendant had voluntary provided the iPhone to SA Dudley during the interview of Defendant. (Id. at 8). Defendant also provided the passcode to the iPhone, and he signed a Consent to Search form. (Id.). SA Montgomery further indicated that "while the FBI might already have all necessary authority to examine the Device," SA Montgomery sought the Search Warrant "out of an abundance of caution." (Id.)

The Honorable Jon T. Huseby, United States Magistrate Judge for the District of Minnesota, determined that probable cause existed to support the issuance of the October 9, 2020, iPhone Search Warrant. (Gov't's Ex. 6). Thereafter, the Government executed the October 9, 2020, iPhone Search Warrant.

## II.    Defendant's Motion to Suppress Statements, Admissions, and Answers On and After September 13, 2020 [Docket No. 45]

Defendant moves the Court for an Order suppressing statements made by him to law enforcement on September 13, 2020.[11] (Def.'s Mot. to Suppress Statements, Admissions, and Answers On and After Sept. 13, 2020. [Docket No. 45]).

---

[11] The Court notes that Defendant's moving papers also generically refer to statements made by Defendant to law enforcement after September 13, 2020. (See, Def.'s Mot. to Suppress Statements, Admissions, and Answers On and After Sept. 13, 2020. [Docket No. 45]). However, Defendant does not raise any argument for suppression in his post-hearing briefing. (See, Mem. in Supp. [Docket No. 82]). Indeed, Defendant has not even identified any such statement made by him to law enforcement, nor does the present record demonstrate any such statement was made. As such, the Court considers Defendant's generic request for suppression of his statements made to law enforcement after September 13, 2020, withdrawn. See, United States v. Edwards, 563 F. Supp. 2d 977, 994 (D. Minn. 2008), aff'd sub nom, United States v. Bowie, 618 F.3d 802 (8th Cir. 2010) ("At the end of the day, as the moving party, at a minimum it is defendant's burden to come forth with some evidence and argument to support his position that evidence, statements or a witness identification should be suppressed."). Therefore, to the extent that it seeks to suppress such statements, the Court recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers On and After September 13, 2020, [Docket No. 45], be **DENIED**.

In support of the present Motion, Defendant contends that after he was taken into custody on September 13, 2020, CI Richards questioned him "about his clothing at the scene of his arrest, before any <u>Miranda</u> warning was given," and SA Dudley "also questioned [him] before advising him of his <u>Miranda</u> rights." (Mem. in Supp. [Docket No. 82], at 10–11). Therefore, Defendant argues, his pre-<u>Miranda</u> statements should be suppressed. (<u>Id.</u>).

**A. Standard of Review**

"[<u>Miranda</u>] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." <u>United States v. Chipps</u>, 410 F.3d 438, 445 (8th Cir. 2005) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)). Accordingly, <u>Miranda</u> warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994) (quoting <u>Miranda</u>, 384 U.S. at 444).

A defendant is entitled to a <u>Miranda</u> warning prior to custodial interrogation. <u>Miranda</u>, 384 U.S. at 444–45. "Interrogation under <u>Miranda</u> includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>United States v. Hull</u>, 419 F.3d 762, 767 (8th Cir. 2005) (quoting <u>Rhode Island v. Innis</u>, 466 U.S. 291, 300–01 (1980)). Whether an incriminating response is sought by an officer is determined "from the perspective of the suspect" and not by the officer's actual intent. <u>United States v. Richardson</u>, 427 F.3d 1128, 1132 (8th Cir. 2005).

A defendant may waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

**B.  Analysis**

The record presently before the Court indicates that Defendant made pre-Miranda, as well as, post-Miranda statements to law enforcement officers on September 13, 2020. (See, Tr. [Docket No. 78], at 48, 92–93; Gov't's Ex. 1).

**i.  Pre-Miranda Statements**

Defendant asserts that on September 13, 2020, he made statements, while he in custody and before being given a Miranda warning, in response to questioning by both CI Richards and SA Dudley. (Mem. in Supp. [Docket No. 82], at 10–11). Accordingly, Defendant contends that "[b]ecause [his] pre-Miranda statements were the result of custodial interrogation, they were unlawfully obtained and should therefore be suppressed." (Id. at 11).

The Government represents "that it will not offer in its case-in-chief those statements made to Criminal Investigator Richards or Special Agent Dudley prior to being advised of his Miranda rights, as captured on Government Exhibit 1." (Mem. in Opp'n [Docket No. 94], at 12). Accordingly, the Government contends that Defendant's motion to suppress statements should be denied as moot. (Id.).

It is undisputed that Defendant was in custody at the time that his pre-Miranda statements were made to law enforcement officers on September 13, 2020. (See, Mem. in Supp. [Docket No. 82]; Mem. in Opp'n [Docket No. 94]). However, to be subject to suppression under Miranda, a statement made while in custody must be made in response to interrogation. United States v. McGlothen, 556 F.3d 698, 701 (8th Cir. 2009) (citing United States v. Londondio, 420

16

F.3d 777, 783 (8th Cir. 2005)). Accordingly, the only question now before the Court is whether Defendant's pre-<u>Miranda</u> statements were made in response to interrogation.

As already noted, "[i]nterrogation under <u>Miranda</u> includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" <u>Hull</u>, 419 F.3d at 767; <u>see also</u>, <u>United States v. Jones</u>, 842 F.3d 1077, 1082 (8th Cir. 2016) (alteration in original) (quoting <u>United States v. Briones</u>, 309 F.3d 610, 612 (8th Cir. 2004)) ("Interrogation, for Miranda purposes, means 'express questioning' and 'words or conduct that officers should know [are] "reasonably likely to elicit an incriminating response from the suspect."'"). "<u>Miranda</u> does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." <u>United States v. Hayes</u>, 120 F.3d 739, 744 (8th Cir. 1997); <u>see also</u>, <u>Chipps</u>, 410 F.3d at 445 ("<u>Miranda</u> does not bar the government from introducing spontaneous statements made during a conversation not initiated by the officer."). Thus, a statement that is voluntary and is "not the product of police questioning or police action likely to produce an incriminating response" is admissible even when made without the benefit of a <u>Miranda</u> warning. <u>Richardson</u>, 427 F.3d at 1132; <u>see also</u>, <u>McGlothen</u>, 556 F.3d at 701 ("Voluntary statements not in response to an interrogation are admissible with or without <u>Miranda</u> warnings.").

The Court first addresses the pre-<u>Miranda</u> questioning by CI Richards. In reference to that questioning, the Court acknowledges that the present record is somewhat ambiguous. However, it can be inferred from the testimony of SA Dudley at the Motions Hearing that shortly after taking Defendant into custody, CI Richards asked him whether some clothes CI Richards

had observed in the Cloud Residence belonged to Defendant. (<u>See</u>, Tr. [Docket No. 78], at 92–93). CI Richards' direct questioning regarding the observed clothing was clearly interrogation. CI Richard's inquiry was plainly designed to identify physical evidence of an inculpatory nature.[12] As such, Defendant's pre-<u>Miranda</u> statement made in response to that questioning must be suppressed. <u>See, e.g.</u>, <u>Miranda</u>, 384 U.S. at 444; <u>Stansbury</u>, 511 U.S. at 322; <u>Chipps</u>, 410 F.3d at 445.

Therefore, to the extent that it seeks to suppress that pre-<u>Miranda</u> statement, the Court recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers On and After September 13, 2020, [Docket No. 45], be **GRANTED**.

The Court next addresses the pre-<u>Miranda</u> questioning by SA Dudley. The only pre-<u>Miranda</u> questioning of Defendant by SA Dudley in the present record occurred at the outset of the September 13, 2020, interview after CI Richards and Officer Heyer had walked Defendant to the front of SA Dudley's FBI vehicle. (<u>See, e.g.</u>, Tr. [Docket No. 78], at 38–39, 94). SA Dudley had already begun recording the September 13, 2020, interview when Defendant arrived at his vehicle. (<u>Id.</u> at 43–44, 47–48, 100; <u>see also</u> Gov't's Ex. 1).

Before giving Defendant a <u>Miranda</u> warning, SA Dudley introduced himself and informed Defendant that he was with the FBI. (Gov't's Ex. 1, at 00:15). SA Dudley also informed Defendant that he was going to advise him of his rights, and afterwards they could chat if Defendant wanted to, but it was up to Defendant. (<u>Id.</u> at 00:20–00:30). This brief introduction did not constitute interrogation. SA Dudley was merely making factual statements normally attendant to arrest and custody by introducing himself and explaining what was about to happen, and those statements were not likely to, and indeed did not, elicit an incriminating response. <u>See</u>,

---

[12] Notably, the Government has not raised any argument to the contrary and has even agreed to not to use Defendant's pre-<u>Miranda</u> statements in its case-in-chief. (Mem. in Opp'n [Docket No. 94], at 12).

South Dakota v. Neville, 459 U.S. 553, 564 n.15 (1983) (citing Rhode Island v. Innis, 446 U.S. 291, 301 (1980)) ("[P]olice words or actions 'normally attendant to arrest and custody' do not constitute interrogation."); Hull, 419 F.3d at 767 ("[W]e generally do not find a mere factual statement to be an interrogation where it serves to inform the suspect as to the status of his case or the investigation into his activities.").

Next, SA Dudley asked if Defendant was looking to receive medical treatment, and Defendant responded, "yeah, I guess so." (Gov't's Ex. 1, at 00:30). SA Dudley then asked if Defendant was "okay right now," and Defendant affirmatively responded, "yeah, I'm alright." (Id. at 00:35; see also, Tr. [Docket No. 78], at 48). These too were merely administrative questions normally attendant with arrest and custody. Moreover, SA Dudley's brief inquiring into whether Defendant was okay to speak with him despite the visible injury was not reasonably likely to elicit an incriminating response. Accordingly, Defendant's pre-Miranda statements to SA Dudley were not the product of interrogation. See, e.g., Neville, 459 U.S. at 564 n.15; Hull, 419 F.3d at 767; see also, United States v. Thompson, No. 05-cr-144 (DWF/JSM), 2005 WL 8176922, at *10 (D. Minn. July 1, 2005) (concluding that a law enforcement officer asking the defendant "if he was hurt did not amount to an interrogation such that a Miranda warning was required").

Therefore, to the extent that it seeks to suppress those pre-Miranda statements, the Court recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers On and After September 13, 2020, [Docket No. 45], be **DENIED**.[13]

---

[13] Nevertheless, the Court notes that the Government has agreed to not to use Defendant's pre-Miranda statements in its case-in-chief. (Mem. in Opp'n [Docket No. 94], at 12).

### ii.  Post-<u>Miranda</u> Statements

As a threshold matter, the Court notes that Defendant does <u>not</u> raise any argument for the suppression of his post-<u>Miranda</u> statements in his post-hearing briefing. (<u>See</u>, Mem. in Supp. [Docket No. 82]). To the extent that it seeks to suppress Defendant's post-<u>Miranda</u> statements, the Court could deny Defendant's present motion on that basis alone. <u>See, e.g.</u>, <u>Edwards</u>, 563 F. Supp. 2d at 994. Nonetheless, in an excess of caution, this Court will address whether Defendant's post-<u>Miranda</u> statements should be suppressed on the merits.

As noted above, <u>Miranda</u> warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" <u>Stansbury</u>, 511 U.S. at 322 (quoting <u>Miranda</u>, 384 U.S. at 444). To be subject to suppression under <u>Miranda</u>, a statement must be made while in custody and in response to interrogation. <u>United States v. McGlothen</u>, 556 F.3d 698, 701 (8th Cir. 2009) (citing <u>United States v. Londondio</u>, 420 F.3d 777, 783 (8th Cir. 2005)). A defendant may nevertheless waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." <u>Miranda</u>, 384 U.S. at 444.

It is undisputed that the questioning of Defendant during the recorded September 13, 2020, interview constituted interrogation. (<u>See</u>, Mem. in Supp. [Docket No. 82]; Mem. in Opp'n [Docket No. 94]). It is also undisputed that Defendant was in custody during the recorded interview. (<u>See</u>, Mem. in Supp. [Docket No. 82]; Mem. in Opp'n [Docket No. 94]). In addition, the audio recording of the September 13, 2020, interview clearly demonstrates that Defendant was read a <u>Miranda</u> warning before the interview began, and that he both verbally and in writing acknowledged that he understood the rights warning. (Gov't's Ex. 2, at 2). The FBI Advice of Rights form signed by Defendant, as well as, his verbal acknowledgement that he was willing to

20

speak with SA Dudley represented an express waiver of those rights. (See, Gov't's Ex. 1, at 1:15; Gov't's Ex. 2).

Accordingly, the only issue now before the Court regarding the September 13, 2020, interview is whether Defendant's waiver of his rights was made voluntarily, knowingly, and intelligently. See, gen., Miranda, 384 U.S. at 444, 475. The validity of a Miranda waiver requires consideration of two distinct inquiries, namely whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was knowingly and intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

### 1. Voluntariness

Courts assess whether a waiver of rights pursuant to Miranda was made voluntarily by considering "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." United States v. Contreras, 372 F.3d 974, 978 (8th Cir. 2004). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was involuntary and not as bearing on the separate question whether the waiver was knowing and intelligent." United States v. Turner, 157 F.3d

552, 555 (8th Cir. 1998) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

As already noted, Defendant does not offer any specific argument that his September 13, 2020, rights waiver was involuntary. (See, Mem. in Supp. [Docket No. 82]).

The Court's review of the totality of the circumstances shown in the present record does not indicate that Defendant's will was in any way overborne. Nothing in the present record indicates that the environment in which the interview occurred was inherently coercive, nor that the interviewers engaged in any threatening or coercive tactics during the interview.

The September 13, 2020, interview was conducted in the driveway of the Cloud Residence in front of SA Dudley's FBI vehicle. (Tr. [Docket No. 78], at 44–45, 95). There were only three law enforcement officers present at the outset of the interview, and one of those officers, Officer Heyer, stepped back shortly after the interview began. (Id. at 52, 56, 96–99). The law enforcement officers' weapons were holstered throughout the interview. (Id. at 46, 57).

Defendant's handcuffs were removed shortly after the interview began, and he remained unhandcuffed for the rest of the interview. (Tr. [Docket No. 78], at 52, 57; see also, Gov't's Ex. 1, at 1:30–3:00). Further, the interview also only lasted for approximately forty-four minutes, thus it was not coercive in duration. See, e.g., United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (noting that interrogation lasting more than two hours was not coercive in duration).

The recording of the September 13, 2020, interview clearly and readily demonstrates that the interviewers did not engage in threatening or coercive tactics to induce Defendant's rights waiver or any of his statements. The interview was conducted in a conversational tone, and the interviewers made no threats or promises to Defendant. See, United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding Miranda waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); see also, Makes Room, 49 F.3d at 415 (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant). Moreover, the recording of the September 13, 2020, interview also demonstrates that Defendant spoke willingly and non-defensively to the interviewers throughout, as well as, that he responded appropriately and coherently to any questions presented.

Therefore, on the present record, the Court concludes that Defendant's waiver of his Miranda rights prior to the September 13, 2020, interview was voluntary.

### 2.  Knowing and Intelligent

Next, the Court must consider whether Defendant's waiver of his rights prior to the interview on September 13, 2020, was knowingly and intelligently made. Vinton, 631 F.3d at 483. The evidence in the record regarding Defendant's understanding of his rights and presence

of mind during the September 13, 2020, interview (as well as throughout the remainder of the interview) consists of the hearing testimony of SA Dudley, the FBI Advice of Rights form, and the audio recording of the September 13, 2020, interview. Defendant does <u>not</u> offer any specific argument that his September 13, 2020, rights waiver pursuant to <u>Miranda</u> was anything other than knowingly and intelligently made. (<u>See</u>, Mem. in Supp. [Docket No. 82]).

On the present record, the Government offers sufficient evidence related to the September 13, 2020, recorded interview of Defendant for the Court to determine that Defendant's initial waiver of his <u>Miranda</u> rights prior to that interview was not only voluntary, but it was also knowingly and intelligently made.

The present record clearly demonstrates that Defendant was read a <u>Miranda</u> warning before the interview began, and he verbally acknowledged that he understood the rights warning. Defendant clearly and affirmatively waived his rights by stating that he was willing to speak with SA Dudley. (Gov't Ex. 1, at 1:15). Defendant then signed the FBI Advice of Rights form further indicating that he wished to speak with the interviewers, and the signing of such a form "carries a significant weight in determining whether [Defendant's] waiver was knowing and intelligent." <u>United States v. Gallardo</u>, 495 F.3d 982, 991 (8th Cir. 2007) (citing <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979)).

Defendant had been drinking prior to the September 13, 2020, interview. (<u>See, e.g.</u>, Tr. [Docket No. 78], at 54). However, the Eighth Circuit has "declined to adopt a per se rule of involuntariness when confronted with intoxication." <u>Makes Room</u>, 49 F.3d at 415. Rather, the Eight Circuit requires an evaluation of whether, in spite of intoxication, "the evidence shows that [the defendant] understood his rights and knowingly waived them." <u>Turner</u>, 157 F.3d at 556. In

determining whether a waiver was made knowingly and intelligently, a court looks to the totality of the circumstances. U.S. v. Harper, 466 F.3d 634, 643 (8th Cir. 2006).

Nothing in the present record indicates that Defendant displayed any signs of confusion or an inability to understand his rights. Defendant talked clearly and coherently for the duration of the interview. Defendant provided appropriate and responsive answers to the questions posed. Defendant never declined to answer questions or otherwise indicated that he no longer wished to talk. Moreover, SA Dudley testified at the Motions Hearing that Defendant "appeared to be . . . lucid," Defendant did not appear to be under the influence of drugs or alcohol, Defendant's speech was coherent, Defendant appeared to understand the questions posed by SA Dudley, and Defendant appeared to understand his Miranda rights. (Tr. [Docket No. 78], at 46–47, 52, 54–56). In sum, the present record does not indicate that Defendant was so intoxicated, fatigued, or confused that he was unable to understand his rights. See, United States v. Annis, 446 F.3d 852, 856 (8th Cir. 2006) (finding the defendant's waiver was knowing and voluntary despite his pain from injuries and meth withdrawal); Turner, 157 F.3d at 556 ("Even if [the defendant] was intoxicated by PCP at the time of his confession, as just discussed, the evidence shows that he understood his rights and knowingly waived them.").

Therefore, on the present record, the Court concludes that Defendant's waiver of his Miranda rights prior to the September 13, 2020, interview was done both knowingly and intelligently.

Accordingly, to the extent that it seeks to suppress Defendant's post-Miranda statements, the Court recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers On and After September 13, 2020, [Docket No. 45], be **DENIED**.

III.    **Defendant's Motion to Suppress Evidence Obtained as a Result of September 13, 2020 Warrantless Searches and Seizures [Docket No. 48]**

Defendant moves this Court for an Order suppressing evidence obtained from the execution of warrantless searches conducted on September 13, 2020. (Mem. in Supp. [Docket No. 82]). Specifically, Defendant seeks to suppress evidence obtained from: (1) the warrantless search of the Smith Residence; and (2) the warrantless search of the Cloud Residence.[14] (Id.).

### A. Standard of Review

The Fourth Amendment guarantees the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "[S]earches and seizures 'conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'" United States v. Muhammad, 604 F.3d 1022, 1027 (8th Cir. 2010) (alteration in original) (quoting Minnesota v. Dickerson, 508 U.S. 366, 372 (1993)). Two such exceptions are where voluntary consent has been given or exigent circumstances are present. See, e.g., Carpenter v. Gage, 686 F.3d 644, 648 (8th Cir. 2012) (citing Mincey v. Arizona, 437 U.S. 385, 39394 (1978)) ("An 'exigent circumstances' exception to the warrant requirement, however, permits a warrantless entry when the needs of law enforcement are so compelling that a warrantless search is objectively reasonable."); Golinveaux, 611 F.3d at

---

[14] The Court notes that Defendant's moving papers also generically refer to the collection of DNA evidence from Defendant by law enforcement. (See, Def.'s Mot. to Suppress Evid. Obtained as a result of Sept. 13, 2020 Warrantless Searches and Seizures. [Docket No. 48]). However, Defendant does not raise any argument for suppression in his post-hearing briefing. (See, Mem. in Supp. [Docket No. 82]). As such, the Court considers Defendant's generic request for suppression of DNA evidence taken from Defendant by law enforcement on September 13, 2020, withdrawn. See, Edwards, 563 F. Supp. 2d at 994. Moreover, even if Defendant had persisted in his request, suppression would not be appropriate because the present record shows that the DNA Evidence was collected pursuant to Defendant's valid and voluntary consent. (See, Gov't's Ex. 1, at 37:25–43:05; Gov't's Ex. 7, at 1; Tr. [Docket No. 78], at 62); see also, United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010) ("Although a warrantless search presumptively violates the Fourth Amendment, voluntary consent to search is a well-recognized exception to the warrant requirement."). Therefore, to the extent that it seeks to suppress such evidence, the Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of September 13, 2020 Warrantless Searches and Seizures, [Docket No. 48], be **DENIED**.

959 ("Although a warrantless search presumptively violates the Fourth Amendment, voluntary consent to search is a well-recognized exception to the warrant requirement."). The burden is on the Government to demonstrate voluntary consent or the existence of an exigency. United States v. Robinson, 414 U.S. 218, 243 (1973); United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005).

In addition, Fourth Amendment rights are personal, and they may not be asserted vicariously. United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004) (citing Rakas v. Illinois, 439 U.S. 128, 133–34 (1978)). Accordingly, to assert Fourth Amendment rights, an individual "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88 (1998). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no standing to claim that they were searched or seized illegally." Barragan, 379 F.3d at 529–30 (citing United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994)).

### B. Analysis

#### i. Warrantless Search of the Smith Residence

Defendant asserts that law enforcement officers "established that Allen Smith was beyond the reach of medical assistance, was dead, and secured the residence and its surroundings" by 12:47 a.m., but "[s]earch activity and a continuous law enforcement presence at the . . . Smith Residence lasted to 4:44 a.m." (See, Mem. in Supp. [Docket No. 82], at 5–8). Thus, Defendant contends that "[a]ll evidence obtained [after 12:47 a.m.], evidence that included the seizure of physical evidence and a large number of photographs, should be suppressed from further use in this prosecution." (Id. at 8).

As a threshold matter, the Parties dispute whether Defendant has standing to challenge a search of the Smith Residence. (See, Id. at 3–5). Defendant contends that he has standing to challenge a search of the Smith Residence because "[a]s someone closely related to the owner, residents, and occupants" of the Smith Residence,[15] Defendant's "status is more closely analogized to an overnight guest," and "[h]is acceptance into the household is sufficient to confer standing to challenge the searches." (Mem. in Supp. [Docket No. 82], at 3–5). Conversely, the Government contends that Defendant "cannot challenge the search of and seizure of evidence from [the Smith] Residence because he was a casual visitor to the home with no legitimate expectation of privacy." (Mem. in Opp'n [Docket No. 94], at 6).

As noted above, the Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. However, Fourth Amendment rights are personal, and therefore, they may not be asserted vicariously. Barragan, 379 F.3d at 529 (citing Rakas, 439 U.S. at 133–34).

"An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" Barragan, 379 F.3d at 529 (citing Carter, 525 U.S. at 88); Rakas, 439 U.S. at 133–34. The defendant bears the burden of proving a reasonable expectation of privacy in the area searched. Rakas, 439 U.S. at 130–31.

To establish a legitimate expectation of privacy, a defendant must show a subjective expectation of privacy and that his expectation of privacy is one that society is prepared to

---

[15] Specifically, Defendant asserts that: the owner of the Smith Residence, Beverly Smith, is his mother's sister; the residents of the Smith Residence, Allen Smith and Derick Smith, are his first cousins; and the occupants of the Smith Residence during the relevant time period, Tammi Cloud and Steve Whitefeather, are Defendant's wife and his wife's son, respectively. (Id.).

recognize as objectively reasonable. "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no standing to claim that they were searched or seized illegally." Barragan, 379 F.3d at 529–30 (citing Gomez, 16 F.3d at 256). Ultimately, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Rakas, 439 U.S. at 134.

The Eighth Circuit has enumerated factors for courts to consider in deciding whether a defendant had an expectation of privacy triggering standing to challenge the constitutionality of a search including:

> [O]wnership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

Gomez, 16 F.3d at 256 (citing States v. Sanchez, 943 F.2d 110, 113 (1st Cir. 1991)).

Here, the present record clearly demonstrates that Defendant was a casual visitor at the Smith Residence. Defendant owns and lives at the Cloud Residence. (See, e.g., Gov't Ex. 1, at 4:55–5:05, 6:10). Nothing in the present record indicates that Defendant was a resident or overnight guest in the Smith Residence at the time of the searches. To the contrary, on September 12, 2020, Defendant woke up at the Cloud Residence, before later going to the liquor store and then to the Smith Residence. (See, e.g., Id. at 5:35–6:40, 12:15, 13:25–13:50, 15:00–16:00). Approximately two hours later, after having some drinks, Defendant was dropped back off at the Cloud Residence, where he went to sleep. (See, e.g., Id., 16:30–17:10). After Defendant woke up and noticed that Tammi Cloud was still gone, he walked back to the Smith

Residence. (See, e.g., Id. at 6:55–7:10, 17:10). However, following his alleged assault on Allen Smith, Defendant again returned to the Cloud Residence. (See, e.g., Id. at 31:50–32:10).

Nothing in the present record indicates that Defendant stored his personal effects in the Smith Residence, and Defendant does not even allege that he has an ownership interest in the Smith Residence. (See, Mem. in Supp. [Docket No. 78]). Nor does Defendant allege that he had control over the Smith Residence, unencumbered access to the Smith Residence, or the ability to regulate other individual's access to the Smith Residence. (See, Id.). Furthermore, Defendant was arrested at the Cloud Residence, and he was not even present at the Smith Residence during the warrantless search by Red Lake police officers or during the execution of the September 13, 2020, Search Warrant. (See, e.g., Tr. [Docket No. 78], at 30, 35, 90–91).

The mere fact that Defendant is related to the owner, residents, and occupants of the Smith Residence does not provide Defendant with a reasonable expectation of privacy in that residence. See, e.g., United States v. Davis, 361 Fed. App'x 704, 705–06 (8th Cir. 2010) (holding the defendant lacked standing to challenge a search his uncle's residence where "[t]he evidence did not show that [the defendant] either lived or stayed more than irregularly at his uncle's residence, that he stored personal effects there which he admitted to owning, or that he had exclusive access to or had taken precautions to maintain privacy in the gun cabinets or the room where the ammunition was found").

As a casual visitor, who was not even present at the time the searches occurred, Defendant lacks standing to challenge the searches of the Smith Residence. See, U.S. v. Heying, No. 14-cr-30 (JRT/SER), 2014 WL 5461988, *17 (D. Minn. Aug. 15, 2014) (citing U.S. v. Perez, 700 F.2d 1232, 1236 (8th Cir. 1983)) ("A casual visitor does not have an expectation of privacy[.]"). For this reason alone, both of Defendant's present motions to suppress evidence

should be denied to the extent that they seek to suppress evidence obtained during the searches of the Smith Residence on September 13, 2020.

Moreover, even if Defendant did have standing, his challenge to the warrantless search of the Smith Residence on September 13, 2020, would still fail.

"Absent consent, an officer's entry into a home generally requires a warrant." Carpenter, 686 F.3d at 648. "An 'exigent circumstances' exception to the warrant requirement, however, permits a warrantless entry when the needs of law enforcement are so compelling that a warrantless search is objectively reasonable." Id. (citing Mincey, 437 U.S. at 393–94). "Such exigencies include the need to render emergency aid to an injured occupant, hot pursuit of a fleeing suspect, and the need to prevent the destruction of evidence." Id. Under the emergency aid or immediate danger exception, law enforcement may enter one's home or its curtilage "without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Michigan v. Fisher, 558 U.S. 45, 47 (2009) (quoting Brigham City v. Stuart, 547 U.S. 398, 405 (2006)). However, the existence of an "emergency assistance" exigency requires an "objectively reasonable basis" to believe that someone within the house or curtilage is in immediate need of assistance. Id. "A warrantless entry is lawful if officers reasonably believed that exigent circumstances existed." Carpenter, 686 F.3d at 648.

Here, an emergency assistance exigency clearly existed when Red Lake police officers arrived at the Smith Residence. The Red Lake Police Department had received a report that there was blood all over and somebody was dead in the Smith Residence. (Def.'s Ex. 5, at 1–2l). When Officer Kingbird arrived at the Smith Residence, he was again informed that there was a deceased individual inside the residence. (Def.'s Ex. 4, at 5). Officer Kingbird entered the residence, and he located Allen Smith who was unresponsive. (Id. at 5–6; Tr. [Docket No. 78], at

72). By 12:47 p.m., other Red Lake police officers had conducted a sweep and determined no one else was inside the Smith Residence. (Def.'s Ex. 5, at 2).

Based on the reports that there was blood all over and somebody was dead in the Smith Residence, law enforcement had an objectively reasonable basis to conclude that someone inside the residence was in need of emergency assistance.[16] Therefore, on the present record, the Court concludes that the initial entry and sweep of the Smith Residence by law enforcement officers was not unreasonable under the Fourth Amendment. See, Michigan, 558 U.S. at 47; Carpenter, 686 F.3d at 648.

Defendant does not challenge the initial entry and sweep of the Smith Residence. (See, Mem. in Supp. [Docket No. 82]). Rather, Defendant asserts that search activity continued after that initial entry and sweep until 4:44 a.m., and Defendant contends that all evidence obtained after 12:47 a.m. must be suppressed. (Id. at 5–8).

However, Defendant's assertion that law enforcement searched the Smith Residence in the interim between the initial entry and sweep and the execution of the September 13, 2020, Search Warrant is simply not supported by the present record. To the contrary, the present record indicates that Officer Kingbird exited the residence after finding Allen Smith unresponsive, the other law enforcement officers exited the residence after determining no one else was in the residence, and Red Lake EMS exited the residence after confirming that Allen Smith was indeed deceased. (See, Gov't's Ex. 4, at 6; Def.'s Ex. 5, at 2).

After conducting the initial entry and sweep, law enforcement officers merely secured the premises until a search warrant was obtained. Segura v. United States, 468 U.S. 796, 810 (1984)

---

[16] Although Officer Kingbird found Allen Smith unresponsive when he entered the Smith Residence, nothing in the present record indicates that he was capable of medically determining that Allen Smith was in fact deceased. Thus, it was still objectively reasonable for Red Lake EMS to enter the residence shortly thereafter simply to confirm that Allen Smith was indeed deceased and beyond medical assistance.

("[S]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents."); United States v. Ruiz-Estrada, 312 F.3d 398, 404 (8th Cir. 2002) ("The act of securing the apartment while awaiting a search warrant comports with the Fourth Amendment."). Indeed, SA Dudley testified at the Motions Hearing that although law enforcement maintained a continued presence at the Smith Residence prior to obtaining the September 13, 2020, Search Warrant, they remained "parked in front" of the residence and "stayed put in their cars and waited as things were developing." (Tr. [Docket No. 78], at 82, 84). Simply put, nothing in the present record indicates that law enforcement officers conducted any search of the Smith Residence in the interim between the initial entry and sweep and the execution of the September 13, 2020, Search Warrant.[17]

Therefore, to the extent that it seeks to suppress evidence obtained from the warrantless search of the Smith Residence, the Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of September 13, 2020 Warrantless Searches and Seizures, [Docket No. 48], be **DENIED**.

### ii. Warrantless Search of the Cloud Residence

Defendant does not dispute that law enforcement officers obtained his consent to search the Cloud Residence "for the purpose of collecting the clothing he wore at the time of the alleged

---

[17] The Court notes that observations made by SA Montgomery in the interim were incorporated into the affidavit filed in support of the September 13, 2020, Search Warrant, as well as, the October 9, 2020, Facebook and iPhone Search Warrants. (See, Gov't's Ex. 4, at 6; Gov't's Ex. 5, at 4; Gov't's Ex. 6, at 4). However, those observations only referenced the conditions outside on the porch and in the driveway of the Smith Residence in plain view. See, United States v. Johnson, 506 F.2d 674, 675 (8th Cir. 1974) ("Under the 'plain view' doctrine, a plain view observation made by a police officer from a position where the officer is entitled to be is not a 'search' within the meaning of the Fourth Amendment."). Nothing in the present record indicates that SA Montgomery conducted any search of the premises prior to obtaining the September 13, 2020, Search Warrant. See, Johnson, 506 F.2d at 675; see also, Nikolas v. City of Omaha, 605 F.3d 539, 546 (8th Cir. 2010) (quoting Kyllo v. United States, 533 U.S. 27, 32 (2001)) (noting that "visual observation is no 'search' at all").

offense conduct."[18] (Mem. in Supp. [Docket No. 82], at 9). Rather, Defendant contends that the search extended beyond the scope of his consent because "[t]he clothing was found exactly where [he] said it would be," yet "the search lasted for ten to fifteen minutes." (Id.). Thus, Defendant argues that "[b]eyond the clothing that was discussed, anything obtained during the unreasonably extended search should be suppressed." (Id. at 10).

Defendant's argument for suppression expressly excludes his clothing, and he does not dispute that he gave valid consent for law enforcement officers to enter the Cloud Residence and seize that clothing. (See, Id. at 9–10). As such, Defendant concedes that his clothing was properly seized.

Therefore, to the extent that it seeks to suppress Defendant's clothing seized during the warrantless search of the Cloud Residence, the Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of September 13, 2020 Warrantless Searches and Seizures, [Docket No. 48], be **DENIED**.

Besides his clothing, Defendant argues that any other evidence seized during the warrantless search of the Cloud Residence should be suppressed. (Mem. in Supp. [Docket No. 82], at 9–10). However, the Government represents that "no items of evidence other than his clothing were seized from Cloud's residence." (Mem. in Opp'n [Docket No. 94], at 11). Because there is nothing to suppress, Defendant's argument is moot.[19]

---

[18] The Court finds that the present record plainly demonstrates that Defendant did indeed provide valid and voluntary consent to search the Cloud Residence for his clothes. (See, e.g., Gov't's Ex. 1, at 33:10–34:50; Gov't's Ex. 7, at 1).

[19] Moreover, on the present record, there is no evidence whatsoever to suggest that ten to fifteen minutes to retrieve Defendant's clothing from the Cloud Residence was excessive. "The standard for measuring the scope of a [person's] consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Fagnan v. City of Lino Lakes, Minn., 745 F.3d 318, 323 (8th Cir. 2014). Here, at a minimum, it was objectively reasonable for law enforcement to enter the Cloud Residence, locate the living room where Defendant stated the clothing was located, search for the four items of clothing that Defendant stated he had been wearing during the alleged offense (a pair of brown leather boots, a grey jacket, blue jeans, and a button up shirt), and to seize those items of clothing. (See,

Therefore, to the extent that it seeks to suppress other evidence seized during the warrantless search of the Cloud Residence, the Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of September 13, 2020 Warrantless Searches and Seizures, [Docket No. 48], be **DENIED**.

## IV. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Warrants), [Docket No. 47]

Defendant moves the Court for an Order suppressing physical evidence obtained from the execution of: the September 13, 2020, Search Warrant; the October 9, 2020, Facebook Search Warrant; and the October 9, 2020, iPhone Search Warrant. (Mem. in Supp. [Docket No. 82]).

### A. Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462

---

Gov't's Ex. 1, at 33:10–34:50). Nothing indicates that law enforcement searched any areas of the Cloud Residence beyond the living room, and it is simply not objectively unreasonable for the law enforcement officers to spend ten to fifteen minutes locating Defendant's clothes in that room and verifying that they seized the correct articles of clothing. Further, had the officers observed any additional evidence while searching the living room for Defendant's clothes, they would have been allowed to seize that evidence pursuant to the plain view exception to the warrant requirement. See, Fagnan, 745 F.3d at 323 (quoting United States v. Bustos-Torres, 396 F.3d 935, 944 (8th Cir. 2009)) (alteration in original) ("The Fourth Amendment permits 'an officer, without a warrant, [to] seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating character is immediately apparent, and the officer has a lawful right to access the object.'").

U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 9–cr–239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005)) (alterations in original). In addition, the issuing court's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. at 238–39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

**B. Analysis**

**i. The September 13, 2020, Search Warrant**

Defendant seeks an Order of this Court suppressing all evidence flowing from the September 13, 2020, Search Warrant. (Def.'s Mot. to Suppress Evid. Obtained as a Result of Search and Seizure (Warrants) [Docket No. 47]; Mem. in Supp. [Docket No. 82], at 8–9).

The September 13, 2020, Search Warrant authorized the search of the Smith Residence, as well as, the white Pontiac Grand Am parked in front of the residence. (Gov't's Ex. 4, at 1, 3). As already noted, Defendant lacks standing to challenge the searches of the Smith Residence. See, supra. Defendant also lacks standing to challenge the search of the white Pontiac Grand Am because he has not demonstrated, or even alleged, that he had an ownership interest in that vehicle, control over that vehicle, keys or unencumbered access to that vehicle, the ability to regulate other individual's access to that vehicle, or even a subjective expectation of privacy in that vehicle. See gen., Rakas, 439 U.S. at 130–31, 133–34; Barragan, 379 F.3d at 529–30; Gomez, 16 F.3d at 256. For this reason alone, Defendant's present motion to suppress evidence should be denied to the extent that it seeks to suppress evidence obtained pursuant to the September 13, 2020, Search Warrant.

Moreover, even if Defendant did have standing, his challenge to the September 13, 2020, Search Warrant would still fail. Defendant's sole argument for suppression is that "[b]ecause this search bears the taint of the unlawful warrantless search of the same location, the results of the subsequent search should be suppressed as the fruit of the poisonous tree." (Mem. in Supp. [Docket No. 82], at 8–9). However, the Court has already found that no prior unlawful search occurred. The initial entry and sweep of the Smith Residence was reasonable pursuant to the emergency aid exception to the warrant requirement, and nothing in the present record indicates that law enforcement conducted any search in the interim between that initial entry and sweep and the execution of the September 13, 2020, Search Warrant. See, supra. Because no prior Fourth Amendment violation occurred, the fruit of the poisonous tree doctrine is not applicable to evidence obtained during the subsequent execution of the September 13, 2020, Search Warrant. See, e.g., United States v. Zacher, 465 F.3d 336, 340 (8th Cir. 2006) (finding that where

there was no Fourth Amendment violation, "the 'fruit of the poisonous tree' doctrine could not apply to any subsequent evidence that the police discovered"); United States v. Berrera-Omana, No. 09-47 (JMR/JJK), 2009 WL 2900328, at *5 (D. Minn. Sept. 3, 2009) ("Because this Court finds no Fourth Amendment violation in the traffic stop, it concludes there is no basis to invoke the 'fruit of the poisonous tree' doctrine under these circumstances.").

"[A] magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Alexander, 574 F.3d 484, 489 (8th Cir. 2009) (quoting United States v. Hart, 544 F.3d 911, 914 (8th Cir. 2008)). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000) (citing United States v. Koelling, 992 F.2d 817, 823 (8th Cir. 1993)).

Considering the affidavit submitted in support of the September 13, 2020, Search Warrant which authorized law enforcement to search the Smith Residence and the white Pontiac Grand Am outside that residence, Judge Brand could reasonably have concluded that there was a fair probability that evidence of the alleged crime would be found in those places. The affidavit established a nexus between the evidence to be searched for and the places to be searched.

Specifically, the Court notes that, in his affidavit, SA Montgomery provided some of the details of the FBI investigation, including that the Red Lake Police Department received a report that there was a deceased individual inside the Smith Residence, Officer Kingbird entered the residence and located an unresponsive male, and Red Lake EMS confirmed that the individual was indeed deceased. (Gov't's Ex. 4, at 5–6). SA Montgomery further indicated that he observed a baseball bat near the front porch steps of the Smith Residence with apparent blood, apparent

38

blood on the front porch and the door leading into the residence, and a white Pontiac Grand Am in the driveway with apparent blood outside of it, a visibly smashed windshield, and rock next to it. (Id. at 6).

Upon review of SA Montgomery's affidavit, this Court finds that Judge Brand had a sufficient basis upon which to believe that probable cause existed for the issuance of the September 13, 2020, Search Warrant. The presence of a deceased individual in the Smith Residence, and apparent blood on the porch and the door leading into the residence, as well as, a baseball bat with apparent blood near the front porch steps, demonstrates a fair probability that evidence of a crime would be found in the Smith Residence. Similarly, the presence of blood near the Pontiac Grand Am, coupled with the fact that it was located in the driveway of the Smith Residence, it had a visibly smashed windshield, and a rock next to it demonstrates a fair probability that evidence of a crime would be found in that vehicle.

As such, the affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime, as well as, a sufficient basis upon which to demonstrate a nexus between the items to be searched for and the places to be searched. Therefore, there was probable cause for Judge Brand to issue the September 13, 2020, Search Warrant.

In addition, assuming solely for the sake of argument that the affidavit of SA Montgomery was not sufficient to establish probable cause or a nexus between the items to be searched for and the place to be searched, the Court concludes that officers relied in good faith on the probable cause determination by Judge Brand when executing the September 13, 2020, Search Warrant.

Although evidence obtained as a result of the execution of a warrant unsupported by probable cause is generally inadmissible, Mapp v. Ohio, 367 U.S. 643 (1961), there is an exception "when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." Davis v. United States, 564 U.S. 229, 238–39 (2011) (quoting United States v. Leon, 468 U.S. 897, 922 (1984)). There are four circumstances in which the good-faith exception does not apply:

> (1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) "the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

United States v. Marion, 238 F.3d 965, 969 (2001).

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of the Smith Residence and the Pontiac Grand Am militates against suppressing the evidence obtained during the execution of the September 13, 2020, Search Warrant. In his affidavit in support of his application for a search warrant, SA Montgomery presented sufficient facts indicating that a crime had occurred in the Smith Residence, and that evidence related to that crime may be found in the Pontiac Grand Am located in the driveway of that residence. Accordingly, the affidavit in support of September 13, 2020, Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." In addition, it did not render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." See gen., Marion, 238 F.3d at 969. Thus, the Court concludes that the officers involved relied in good faith on the September 13, 2020, Search Warrant which had been issued by Judge Brand.

Therefore, to the extent that it seeks to suppress evidence obtained from the execution of the September 13, 2020, Search Warrant, this Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Warrants), [Docket No. 47], be **DENIED**.

### ii.  The October 9, 2020, Facebook Search Warrant

Defendant seeks an Order of this Court suppressing all evidence flowing from the October 9, 2020, Facebook Search Warrant. (Def.'s Mot. to Suppress Evid. Obtained as a Result of Search and Seizure (Warrants) [Docket No. 47]). Defendant does <u>not</u> offer any specific argument for suppression in his post-hearing briefing.

The Court must first address the threshold issue of standing. Defendant's Motion seeks to suppress <u>all</u> evidence flowing from the October 9, 2020, Facebook Search Warrant. Defendant does not affirmatively limit his suppression request to only evidence flowing from the Facebook account belonging to him. As discussed above, the October 9, 2020, Facebook Search Warrant authorized the search of <u>three</u> different accounts. One of those accounts belongs to Defendant, while two of those accounts belong to Tammi Cloud. Accordingly, the Court must first address this threshold, and potentially dispositive, issue of standing.

As already noted, "[a]n individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" <u>Barragan</u>, 379 F.3d at 529 (citing <u>Minnesota</u>, 525 U.S. at 88); <u>Rakas</u>, 439 U.S. at 133–34. The defendant bears the burden of proving a reasonable expectation of privacy in the area searched. <u>Rakas</u>, 439 U.S. at 130–31. "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no standing to claim that they were searched or seized illegally." <u>Barragan</u>, 379 F.3d at 529–30 (citing <u>Gomez</u>, 16 F.3d at 256). The

41

Eighth Circuit has enumerated factors for courts to consider in deciding whether a defendant had an expectation of privacy triggering standing to challenge the constitutionality of a search including:

> [O]wnership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

Gomez, 16 F.3d at 256 (citing States v. Sanchez, 943 F.2d 110, 113 (1st Cir. 1991)).

On the record now before the Court, each of these factors weighs in favor of finding that Defendant lacks standing to assert any challenge to evidence flowing from Tammi Cloud's Facebook accounts as a result of the execution of the October 9, 2020, Facebook Search Warrant. Defendant fails to even allege that he has an ownership interest or control over Tammi Cloud's Facebook accounts; fails to even allege that he ever used Tammi Cloud's Facebook accounts or had any ability to regulate access to her accounts; and fails to even allege that he had a subjective expectation of privacy in Tammi Cloud's Facebook accounts. Moreover, nothing on the record now before the Court supports finding that Defendant had an objective expectation of privacy in Tammi Cloud's Facebook accounts, and Defendant has failed to demonstrate that the totality of the circumstances surrounding the execution of the October 9, 2020, Facebook Search Warrant merit finding that he had an expectation of privacy in Tammi Cloud's Facebook accounts.

On that basis, the Court concludes that Defendant lacks standing to challenge the search of Tammi Cloud's Facebook accounts, and therefore, Defendant lacks standing to seek the suppression of any evidence flowing from Tammi Cloud's Facebook accounts. Thus, the Court's discussion hereafter of Defendant's request to suppress evidence flowing from the execution of the October 9, 2020, Facebook Search Warrant is limited solely to evidence flowing from his

Facebook          account          associated          with          the          URL
https://facebook.com/profile.php?id=100040164905291.

As already noted, "a magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" Alexander, 574 F.3d at 489 (quoting Hart, 544 F.3d at 914). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" Tellez, 217 F.3d at 550 (citing Koelling, 992 F.2d at 823).

Considering the affidavit submitted in support of the October 9, 2020, Facebook Search Warrant which authorized law enforcement to search the Defendant's at-issue Facebook account, Judge Huseby could reasonably have concluded that there was a fair probability that evidence of the alleged crime would be found on Defendant's Facebook account. The affidavit established a nexus between the evidence to be searched for and said Facebook account.

Specifically, the Court notes that, in his affidavit, SA Montgomery provided some of the details of the investigation, including that Allen Smith was found dead in the Smith Residence shortly after midnight on September 13, 2020, and there was apparent blood outside the residence on the front porch and the door leading into the residence. (Gov't Ex. 5, at 4). SA Montgomery further indicated that Defendant had been interviewed by law enforcement. (Id. at 5). During that interview, Defendant had stated that several hours earlier he had found his wife, Tammi Cloud, naked in bed with Allen Smith, and he proceeded to punch, kick, and throw a cabinet at Allen Smith. (Id. at 6).

A few hours later, Tammi Cloud called Defendant and told him that Allen Smith had passed away. (Id.). Defendant "then made a post on his Facebook account to the effect of 'I'm sorry I might be going away for murder I caught my so call [sic] wife cheating on me." (Id.). SA

Montgomery included a screenshot of that Facebook post in the affidavit. (Id. at 7). SA Montgomery also indicated that the Facebook URL https://facebook.com/profile.php?id=100040164905291 was identified as belonging to Defendant. (Id.). In addition, SA Montgomery indicated that Defendant had been shown that Facebook post and had stated the aforementioned Facebook account belonged to him, and he made that Facebook post. (Id.).

SA Montgomery also indicated that Tammi Cloud had stated that Defendant had caught her and Allen Smith having sex at the Smith Residence, and he proceeded to punch Allen Smith. (Id. at 8).

Upon review of SA Montgomery's affidavit, this Court finds that Judge Huseby had a sufficient basis upon which to believe that probable cause existed for the issuance of the October 9, 2020, Facebook Search Warrant as it relates to Defendant's Facebook account. The affidavit contains information concerning Defendant's involvement in the alleged crime. (Id. at 6, 8). The affidavit also contains information indicating that Defendant's made a Facebook post indicating that he "might be going away for murder" after he was informed that Allen Smith had passed away. (Id. at 6–7). In addition, the affidavit contains information indicating that Defendant stated the at-issue Facebook account belonged to him, and he made the aforementioned Facebook post. (Id. at 7).

Accordingly, the affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime, as well as, a sufficient basis upon which to demonstrate a nexus between the items to be searched for and the Facebook account to be searched. Therefore, there was probable cause for Judge Huseby to issue the October 9, 2020, Facebook Search Warrant as it relates to the Defendant's Facebook account.

In addition, the Court here too concludes that officers relied in good faith on the probable cause determination by Judge Huseby when executing the October 9, 2020, Facebook Search Warrant.

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of the Defendant's Facebook account militates against suppressing the evidence obtained during the execution of the October 9, 2020, Facebook Search Warrant. The affidavit in support of the October 9, 2020, Facebook Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," nor did it render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." See, gen., Marion, 238 F.3d at 969. Thus, the Court concludes that the officers involved relied in good faith on the October 9, 2020, Facebook Search Warrant which had been issued by Judge Huseby.

Therefore, to the extent that it seeks to suppress evidence obtained from the execution of the October 9, 2020, Facebook Search Warrant, this Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Warrants), [Docket No. 47], be **DENIED**.

### iii. The October 9, 2020, iPhone Search Warrant

Defendant seeks an Order of this Court suppressing all evidence flowing from the October 9, 2020, iPhone Search Warrant. (Def.'s Mot. to Suppress Evid. Obtained as a Result of Search and Seizure (Warrants) [Docket No. 47]). Defendant does not offer any specific argument for suppression in his post-hearing briefing.

As a threshold matter, the present record clearly indicates that Defendant voluntarily consented to the search of his iPhone. (Gov't's Ex. 1, at 39:10–40:15; Gov't's Ex. 7, at 1).

Indeed, Defendant even provided SA Gregory with the passcode to access the iPhone, thereby further facilitating the search. (Gov't Ex. 1, at 39:40–40:00). Because the present record demonstrates that law enforcement contained Defendant's valid and voluntary consent prior to searching his iPhone, law enforcement was <u>not</u> required to also obtain a search warrant. <u>See, e.g.</u>, <u>Golinveaux</u>, 611 F.3d at 959 ("Although a warrantless search presumptively violates the Fourth Amendment, voluntary consent to search is a well-recognized exception to the warrant requirement.").

Therefore, Defendant's challenge to the October 9, 2020, iPhone Search Warrant is moot. For this reason alone, Defendant's present motion to suppress evidence should be denied to the extent that it seeks to suppress evidence obtained from the execution of the October 9, 2020, iPhone Search Warrant.

Nevertheless, in an abundance of caution, the Court will address the issue of whether the October 9, 2020, iPhone Search Warrant was supported by probable cause. "[A] magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" <u>Alexander</u>, 574 F.3d at 489 (quoting <u>Hart</u>, 544 F.3d at 914). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" <u>Tellez</u>, 217 F.3d at 550 (citing <u>Koelling</u>, 992 F.2d at 823).

Considering the affidavit submitted in support of the October 9, 2020, iPhone Search Warrant which authorized law enforcement to search Defendant's iPhone, Judge Huseby could reasonably have concluded that there was a fair probability that evidence of the alleged crime would be found in Defendant's iPhone. The affidavit established a nexus between the evidence to be searched for and said iPhone.

Specifically, the Court notes that, in his affidavit, SA Montgomery again provided some of the details of the investigation, including that Allen Smith was found dead in the Smith Residence, and Defendant had stated that he had found his wife, Tammi Cloud, naked in bed with Allen Smith, and he proceeded to punch, kick, and throw a cabinet at Allen Smith. (Gov't's Ex. 6, at 4–6). SA Montgomery further indicated that a few hours later, Tammi Cloud called Defendant and told him that Allen Smith had passed away, and "[i]t is likely that [Defendant] took this call on the subject phone." (Id. at 6). Defendant then made a post on his Facebook account that he "might be going away for murder." (Id. at 6–7). In addition, SA Montgomery indicated that Defendant had voluntary provided the iPhone to SA Dudley, Defendant provided SA Dudley with the passcode to the iPhone, and Defendant signed a Consent to Search form. (Id. at 8).

Upon review of SA Montgomery's affidavit, this Court finds that Judge Huseby had a sufficient basis upon which to believe that probable cause existed for the issuance of the October 9, 2020, iPhone Search Warrant. The affidavit contains information concerning Defendant's involvement in the alleged crime. (Id. at 5–7). The affidavit also contains information indicating that Defendant's subsequently received a phone call from Tammi Cloud, likely on the at-issue iPhone, and she informed Defendant that Allen Smith had passed away. (Id. at 6). After he was informed of Allen Smith had passed away, Defendant made a Facebook post indicating that he "might be going away for murder," and it can be reasonably inferred that he likely used his iPhone to make that post. (See, Id. at 6–7). In addition, the affidavit contains information indicating that the at-issue iPhone belonged to Defendant. (Id. at 8).

Accordingly, the affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime, as well as, a

sufficient basis upon which to demonstrate a nexus between the items to be searched for and the iPhone to be searched. Therefore, there was probable cause for Judge Huseby to issue the October 9, 2020, iPhone Search Warrant.

In addition, the Court again concludes that officers relied in good faith on the probable cause determination by Judge Huseby when executing the October 9, 2020, iPhone Search Warrant.

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of the Defendant's iPhone militates against suppressing the evidence obtained during the execution of the October 9, 2020, iPhone Search Warrant. The affidavit in support of the October 9, 2020, iPhone Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," nor did it render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." See, gen., Marion, 238 F.3d at 969. Thus, the Court concludes that the officers involved relied in good faith on the October 9, 2020, iPhone Search Warrant which had been issued by Judge Huseby.

Therefore, to the extent that it seeks to suppress evidence obtained from the execution of the October 9, 2020, iPhone Search Warrant, this Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Warrants), [Docket No. 47], be **DENIED**.

## V.    Conclusion

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.  Defendant's Motion to Suppress Statements, Admissions, and Answers On and After September 13, 2020, [Docket No. 45], be **GRANTED in part** and **DENIED in part**, as discussed above;

2.  Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Warrants), [Docket No. 47], be **DENIED**, as discussed above; and

3.  Defendant's Motion to Suppress Evidence Obtained as a Result of September 13, 2020 Warrantless Searches and Seizures, [Docket No. 48], be **DENIED**, as discussed above.

Dated: August 10, 2021                          s/Leo I. Brisbois
                                                Leo I. Brisbois
                                                U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.